UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| 1ST SOURCE BANK, | ) |
| | ) |
| Plaintiff/Counter-defendant, | ) |
| | ) |
| v. | ) Case No. 3:15-CV-261-JD |
| | ) |
| JOAQUIM SALLES LEITE NETO, *et al.*, | ) |
| | ) |
| Defendants/Counter-plaintiffs. | ) |

## **OPINION AND ORDER**

Now before the Court is the Motion for Summary Judgment [DE 78] filed by Plaintiff 1st Source Bank ("1st Source") against Defendants Joaquim Salles Leite Neto ("Neto") and Wells Fargo Bank Northwest, National Association, in its capacity as Owner Trustee ("Wells Fargo" or "Owner Trustee") (collectively, "Defendants"). 1st Source's motion seeks summary judgment on its sole claim for breach of contract against Defendants and on Neto's sole counterclaim for negligent misrepresentation.[1] Having considered the parties' submissions [DE 78-79; DE 103; DE 105-1[2]] and for the reasons discussed below, the motion is GRANTED.

---

[1] This case is at issue on 1st Source's First Amended Complaint [DE 19], the Amended Answer filed by Owner Trustee Wells Fargo [DE 33], the Amended Answer and First Counterclaim filed by Neto [DE 34], and 1st Source's Answer to the Counterclaim [DE 37]. The pleadings demonstrate that jurisdiction is established under 28 U.S.C. § 1332.

[2] The Defendants consented to the filing of 1st Source's Amended Reply [DE 105], and so, the undersigned considers it timely filed, even if not separately entered on the docket per the magistrate judge's direction [DE 106].

# I. FACTUAL BACKGROUND

The underlying facts of this case are largely undisputed as demonstrated by the pleadings. In 2009, Neto entered into a trust agreement via Quest Trading LLC (one of Joaquim's affiliated business interests) with Wells Fargo to purchase an airplane (a Dassault Falcon 2000) for use in his business because, as a citizen of Brazil, he could not register the plane in the U.S. himself [DE 79-4; DE 79-5]. In 2010, the airplane was registered with the FAA and the registered owner was identified as Wells Fargo [DE 79-6 at 8].

Later that year, Joaquim requested a loan from 1st Source for the airplane and he began corresponding with 1st Source loan officer Eduardo Ferreira [DE 79-2 at 7]. 1st Source was advised that the airplane would be hangered and flown primarily in Brazil [DE 103-1 at 16]. In December, Joaquim accepted 1st Source's Indicative Financing Proposal which (similar to previous versions) 1st Source believed achieved Joaquim's "objective" [DE 79-6 at 14-16] (noting that the debtor (a U.S. Trust) would be responsible for all taxes, fees, and duties associated with the use and operation of the airplane). 1st Source's Finance Commitment Letter was later accepted by Joaquim, which stated in relevant part: "[w]e believe these terms meet your desires as well as fall within our agreed upon credit requirements and applicable U.S. and Brazilian laws. The terms of the aircraft financing would be as follows . . .". [DE 79-6 at 18-20]. The letter then identified the terms of the financing, one of which was that the debtor would be responsible for all taxes and duties associated with the use and operation of the airplane. Neto argues that he relied on these statements (and the fact that the loan was ultimately issued) to imply that Brazilian law permitted his contemplated use of the aircraft with a U.S. registration and trust ownership [DE 103 at 3, 8; DE 103-2 at 20, 24-25]—despite the fact that only Neto's lawyers evaluated the ownership structure and advised Neto of its legal compliance prior to 1st Source's provision of financing services [DE 103-1 at 26, 38; DE 103-2 at 11-13, 19, 27-28].

In January 2011, Wells Fargo borrowed $6 million plus fees from 1st Source[3] and pledged the airplane as collateral [DE 79-7 ("the Note"); DE 79-8 "The Loan & Security Agreement"]. At that time, Neto also signed a personal guarantee for that loan which unconditionally guaranteed to 1st Source payment of the Note in full when due [DE 79-9 ("the guarantee")[4]; DE 103-2 at 18]. The Security Agreement provided that the Owner Trustee would "keep the Collateral safe and secure . . . use and operate the Collateral with care and only with qualified personnel in the ordinary course of Customer's business and in conformity with all laws and regulations . . ." and would not "permit [the airplane's] identity to be lost, or otherwise dispose of [the] Collateral or any interest therein . . .". A default under the Security Agreement would occur for failing to make a payment when due or when the Owner Trustee failed to perform any obligation under the Security Agreement. Upon default, 1st Source was entitled to declare all or any part of the remaining unpaid indebtedness to be immediately due and payable, and 1st Source could charge a default interest rate equal to the rate set forth in the Note (5.49% in excess of the Index Rate) plus an additional three percent.[5] The Security Agreement expressly

---

[3] 1st Source admits that it holds itself out as having knowledge of aircraft financing and banking, and that it offers aircraft financing through its Aviation Division of its Specialty Finance Group [DE 37 at 3].

[4] The Guarantee explicitly provided that the "liability under this Guarantee shall be absolute and unconditional" and that the "Guarantee constitutes the direct, general and unconditional obligation of the Guarantor, is a continuing guarantee, is irrevocable and is a guarantee of payment and not of collection. The obligations of the Guarantor under this Guarantee are unconditionally binding on the Guarantor, it being the intention of the Guarantor that this Guarantee shall not be discharged except by the payment in full of all amounts due under this Guarantee" [DE 79-7 at 3-5].

[5] Section 1 of the Note, section 5(b) of the Loan and Security Agreement, and section 2 of the Guarantee indicate that 1st Source is entitled to recover its attorneys' fees, litigation expenses, and costs.

stated that "[i]t is not necessary for Bank to exercise its rights and remedies in respect of the Collateral before collecting."

In June 2012, the Brazilian government seized the airplane in connection with an investigation into an alleged scheme to avoid paying Brazilian import tax on the airplane. The Brazilian government determined that the airplane was "being used by a person [identified as Joaquim Salles] and for a purpose other than that which led" to the tax break [DE 79-10 at 7-76]; although, Joaquim was later acquitted of all criminal charges brought against him for alleged tax evasion and false statements [DE 92; DE 92-1]. For several years, Neto continued to pay 1st Source for his debt on the plane, making almost $3 million in payments. The payment due on September 27, 2014 was not made and payments altogether stopped being made in December 2014 [DE 79-11 at 2].

On October 9, 2014, 1st Source issued a Demand and Acceleration Notice to Wells Fargo and Neto, accelerating the balance due under the Note [DE 19 at 25-26]. On March 29, 2016, 1st Source's attorney in Brazil sent a notice of default to Neto. 1st Source filed suit on an insurance claim under the Aircraft Policy and recovered at least $3,075,000.00—Neto was a named defendant in this action. *See* Case No. 3:15-cv-00125-WCL-JEM. 1st Source also brought this action on June 24, 2015, seeking to recover the sum of $2,057,600.52, plus interest. As of January 26, 2017, the total amount due is $2,306,807.20, plus daily interest through the date of judgment, and attorneys' fees, expenses, and costs [DE 79-11 at 4].

1st Source has moved for summary judgment on Neto's counterclaim for negligent misrepresentation and on 1st Source's claim that Wells Fargo is in default under the Note and Security Agreement and Neto breached a valid and enforceable personal guarantee. Neto

responds with the affirmative defenses of 'impairment of collateral' and 'failure to mitigate damages,' but neither relieve the Defendants of their obligations.

### III. STANDARD OF REVIEW

Summary judgment is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999).

### IV. DISCUSSION

**A. Claim for Breach of Contract and Affirmative Defenses**

The parties agree that Indiana law controls the substantive issues in this case and Indiana law relating to contracts is well established. "Indiana courts zealously defend the freedom to contract." *State v. Int'l Bus. Machines Corp.*, 51 N.E.3d 150, 160 (Ind. 2016) (citing *Peoples Bank & Trust Co. v. Price*, 714 N.E.2d 712, 717 (Ind. Ct. App. 1999)). "'The existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract.'" *Id*. (quoting *Zoeller*

5

*v. E. Chicago Second Century, Inc*., 904 N.E.2d 213, 221 (Ind. 2009)); *see also*, *New Welton Homes v. Eckman*, 830 N.E.2d 32, 35 (Ind. 2005) (courts must not displace the contractually specified rights and remedies but "must leave to the individual parties the right to make the terms of their agreements as they deem fit and proper, and, as long as those terms are clear and unambiguous and are not unlawful, we can only enforce them as agreed upon."). Additionally, courts in Indiana routinely enforce personal guaranties. *See, e.g., Bruno v. Wells Fargo Bank N.A*, 850 N.E.2d 940 (Ind. Ct. App. 2007) (enforcing a personal guaranty on a line of credit); *Modern Photo Offset Supply v. Woodfield Group*, 663 N.E.2d 547 (Ind. Ct. App. 1996) ("we interpret a guaranty applying the same rules applicable to other contracts, and in the absence of ambiguity, the construction of a guaranty is a question of law."). Under Indiana law, a guaranty is an independent contract to assume liability for performance of a duty or payment of a debt if the primary obligor defaults in performance or payment. *McEntire v. Indiana Nat. Bank*, 471 N.E.2d 1216, 1223 (Ind. Ct. App. 1984) (citations omitted). Thus, upon default of his principal, a guarantor becomes primarily liable on the debt, subject to the type of guaranty executed (conditional or unconditional) and to conditions contained in the agreement itself. *Id*.

Furthermore, the Uniform Commercial Code, as adopted in Indiana, states "[i]n an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings." Ind. Code § 26-1-3.1-308(a). *See Payne v Mundaca Investment Corp*, 562 N.E.2d 51, 58 (Ind. Ct. App. 1990). And under Indiana Code § 26-1-3.1-308(b):

> If the validity of signatures is admitted or proved and there is compliance with subsection (1), a plaintiff producing the instrument is entitled to payment if the plaintiff proves entitlement to enforce the instrument under section IC 26-1-3.1-301, unless the defendant proves a defense or claim in recoupment . . .

6

There is no dispute, and Wells Fargo admits, that it executed the Note and Security Agreement. The unambiguous language of the Note and Security Agreement demonstrate that 1st Source is the holder of the Note and that it is entitled to enforce the Note and Security Agreement. Further, Defendants admit that Wells Fargo defaulted under the terms of the Note and Security Agreement. First, required payments were not made when due. 1st Source accelerated the entire balance due and Joaquim admitted that a payment was not made because the funds were not available to make a payment [DE 79-2 at 11]. Second, seizure of the airplane by the Brazilian authorities (despite Defendants opposing the same as unwarranted) was a default under the Security Agreement which required Wells Fargo to keep the airplane safe and secure, pay any tax levied by any governmental authority, and not permit the airplane's identity to be lost. Accordingly, Wells Fargo is in default under the Note and Security Agreement.

As to Joaquim, he admits that he executed the personal guarantee and understood the terms (and he does not raise any concerns with respect to ambiguity). By signing it, Joaquim became liable for the debts of the Owner Trustee Wells Fargo. Despite this personal liability, Joaquim has not paid the obligations owed to 1st Source. Accordingly, under the unambiguous terms of the unconditional guarantee, Joaquim is liable to 1st Source for the underlying debt, and all attorneys' fees and costs incurred in collecting the debt and enforcing the guarantee. *See McEntire*, 471 N.E.2d at 1223 (noting that a guarantor owes payment or other performance of the obligation secured, irrespective of his ownership of or rights in the collateral).

Impairment of Collateral[6]

---

[6] The Court addresses the merits of the defense although the Security Agreement expressly stated that "[i]t is not necessary for Bank to exercise its rights and remedies in respect of the Collateral before collecting" [DE 79-8 at 3], and the Note indicated a waiver of any requirement that the lender exhaust any rights or take action against the borrower or security for the obligations covered by the guarantee [DE 79-9 at 3]. *See, e.g., Walker v. McTague*, 737 N.E.2d 404, 409 n.3

"In Indiana, the guarantor of a debt may seek to avoid personal liability in a suit by a creditor by asserting the impairment of collateral defense." *Cole v. Loman & Gray, Inc.*, 713 N.E.2d 901, 904 (Ind. Ct. App. 1999). Under this defense, "if the facts establish that the creditor's conduct unjustifiably impaired the collateral securing the debt," the guarantor's liability will be discharged. *Id*. "Impairment of collateral has been defined as both injury to the value of the collateral and deterioration of the interest securing the collateral, and as unreasonable acts which make the collateral unavailable to the surety and increase his risk." *Id*. (internal citations omitted); *see also, Alani v. Monroe County Bank*, 712 N.E.2d 19, 22-23 (Ind. Ct. App. 1999) (noting that courts contemplate the creditor's actions in determining whether there has been an unjustified impairment of collateral). The underlying purpose of the impairment of collateral defense is to prevent the guarantor from being exposed to personal liability beyond that which was expected at the time the parties entered into the contract secured by the collateral. *Id*.; *Leaf Funding, Inc. v. Brogan Pharm., Inc*., 642 F. Supp. 2d 844, 853 (N.D. Ind. 2009). For instance, when "a creditor releases or negligently fails to protect security put in his possession by the principal debtor, the surety is released to the extent of the value of the security so impaired." *White v. Household Finance Corp*., 302 N.E.2d 828, 832 (Ind. Ct. App. 1973); *see also Farmers Loan & Trust Co. v. Letsinger*, 652 N.E.2d 63, 66 (Ind. 1995) ("Guarantors and sureties are exonerated if the creditor by any act, done without their consent, alters the obligation of the principal in any respect or impairs or suspends the remedy for its enforcement.") (quoting *Weed Sewing Mach. Co. v. Winchel*, 7 N.E. 881 (Ind. 1886)); *Williams v. Lafayette Prod. Credit Ass'n*, 508 N.E.2d 579, 583 (Ind. Ct. App. 1987) (holding that when

---

(Ind. Ct. App. 2000) (indicating that with post-default treatment of collateral where the guarantor is actually facing primary liability, he is entitled to fair treatment in the reduction of that liability) (citation omitted).

collateral is left in the possession of the debtor, part of the risk assumed by the guarantor is that the debtor's actions may impair the collateral and any such harm to the collateral by the debtor cannot be attributed to the creditor without some improper act by the creditor); *Hedrick v. First Nat. Bank Trust Co.*, 482 N.E.2d 1146, 1149 (Ind. Ct. App. 1985) (decrease in value of the collateral could not be attributed to the creditor bank). Defendants have the burden of proving impairment of collateral. *See, e.g., Bartle v. Health Quest Realty VII*, 768 N.E.2d 912, 923 (Ind. Ct. App. 2002) (noting that Bartle failed to prove that there was a genuine issue of material fact on his defense that he was released from the obligation due to impairment of the collateral).

Defendants summarily argue that "as a secured creditor with a recorded security interest in the Aircraft, 1st Source could have taken further action in Brazil to release the collateral from the [Brazilian authorities]." [DE 103 at 11]. Yet, in making this argument, Defendants have not identified any action (or inaction) by 1st Source that in some way influenced the seizure of the airplane by the Brazilian government in the first place. In fact, after 1st Source learned that airplanes were being detained in Brazil for further investigation, 1st Source notified all of its Brazilian customers, including Joaquim [DE 79-6 at 3, 161-63]. Despite this warning, Joaquim was surprised when his airplane was seized because he had rested on his lawyer's assurances that his aircraft would not be subject to seizure based on the ownership structure [DE 103-2 at 19].

Thereafter, when Quest attempted to secure release of the airplane, the authorities refused to release the airplane without a payment which equaled the full amount of the import tax due, plus the market value of the airplane [DE 79-2 at 14]. And, 1st Source had no rights to obtain possession of the airplane after it was seized, although it was able to suspend the sale of it with notice of its security interest [DE 79-10 at 4-5]. The airplane is still understood to be under the control of the Brazilian authorities, and no evidence permits an inference that 1st Source

9

impaired—let alone, unjustifiably impaired—the airplane. As a matter of law, Defendants' impairment of collateral defense fails.

Mitigation of Damages

When a party breaches a contract, the other, non-breaching party is required to make a reasonable effort to act in such a manner as to decrease the damages caused by the breach. *See Fischer v. Heymann*, 12 N.E.3d 867, 871 (Ind. 2014); *Leaf Funding*, 642 F.Supp.2d at 852. Failure to mitigate damages is not a bar to recovery, but only reduces the damages that the non-breaching party may recover. *See House v. First American Title Co.*, 883 N.E.2d 197, 202 (Ind. Ct. App. 2008). The Defendants must prove that 1st Source did not use reasonable diligence to mitigate its damages. *See Fischer*, 12 N.E.3d at 871; *Leaf Funding*, 642 F.Supp.2d at 852. The defense of failure to mitigate damages has two elements: (1) the defendant must prove that the plaintiff failed to exercise reasonable care to mitigate plaintiff's post-injury damages; and (2) the defendant must prove that the plaintiff's failure to exercise reasonable care caused the plaintiff to suffer an identifiable item of harm not attributable to the defendant's negligent conduct. *Foster v. Owens*, 844 N.E.2d 216, 221 (Ind. Ct. App. 2006).

The only basis Defendants assert for 1st Source's alleged failure to mitigate damages is 1st Source's settlement of its claim, *see* Case No. 3:15-cv-00125-WCL-JEM, under the Lienholders Interest Endorsement of the Aircraft Policy [DE 79-2 at 12; DE 79-3 at 8; DE 103 at 21-22]. Joaquim and Wells Fargo contend, without citation to any legal authority, that 1st Source failed to mitigate damages when it settled the claim under the Aircraft Policy for less than 100% of what was owed to 1st Source.

However, contrary to Defendants' argument, the duty to minimize the amount of loss, does not equate to a duty to collect the loss from someone in particular. In other words, the

receipt of payment by 1st Source under the Aircraft Policy did not extinguish the debt that Defendants obligated themselves to pay. Thus, even if 1st Source had obtained a full recovery under the Aircraft Policy (as the Defendants claim it should have done), all that would have been accomplished is trading one creditor for another (in fact, 1st Source had assigned its rights to its claim to the extent of payment) [DE 79-11 at 3, 12-15]. Accordingly, 1st Source's actions in this respect do not constitute a failure to mitigate.

Moreover, Indiana law recognizes that "if the contract in question is an absolute guaranty, it 'casts no duty upon the creditor or holder of the obligation to attempt collection from the principal debtor before looking to the guarantor.'" *Kruse v. Nat'l Bank of Indianapolis*, 815 N.E.2d 137, 141 (Ind. Ct. App. 2004) (citations omitted). Although 1st Source went to its insurer for payment, there is no dispute that the unconditional guarantee that Joaquim entered into made him responsible for payment in full of the amounts due, regardless of any settlement by 1st Source under the applicable Aircraft Policy. *See, e.g., Auto. Fin. Corp. v. Kaput*a, No. 1:04-CV-1496-JDT-TAB, 2005 WL 2100266, at *4 (S.D. Ind. Aug. 24, 2005) (reasoning that "[a]n unconditional guaranty is 'a guaranty whereby the guarantor agrees to answer for the debt of the debtor, notwithstanding the occurrence or nonoccurrence of any event either within or not within the contemplation of the parties at the time the guaranty is executed.'").

Because Defendants offer no facts (let alone legal authority) supporting any inference of 1st Source's failure to mitigate damages based on the insurance settlement, summary judgment is proper in favor of 1st Source.

## B. Neto's Counterclaim for Negligent Misrepresentation

Indiana recognizes the tort of negligent misrepresentation in limited circumstances. A claim for negligent misrepresentation is based on the Restatement (Second) of Torts section 552(1) which provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 747 (Ind. 2010); *see Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 742 (Ind. 2010) (although the economic loss rule operates as a general rule to preclude recovery in tort for any purely economic loss caused by negligence, there are exceptions to the general rule that apply "in appropriate circumstances" involving contracts for services); *see also*, *JMB Mfg., Inc. v. Child Craft, LLC*, 799 F.3d 780, 790 (7th Cir. 2015) (in commercial settings, the tort of negligent misrepresentation is designed to protect plaintiffs who reasonably rely on advice provided by defendants who are in the business of supplying that information, and that is why Indiana recognizes the tort in situations involving lawyers, fiduciaries, and insurance companies).

Regardless of the fact that the exceptions to the economic loss rule are not especially well-defined, *see Binns v. Ocwen Loan Servicing, LLC*, 2015 WL 5775827 at *7 (S.D. Ind. Apr. 1, 2015), even if 1st Source was rendering professional advice akin to a broker, attorney, abstractor, or surveyor (as Neto contends), the undisputed evidence demonstrates that 1st Source did not provide advice on the legalities of the airplane's registration or ownership structure, let alone make representations concerning the appropriateness of any subsequent use of the aircraft.

In short, the creation of the trust in 2009, the purchase of the airplane in July 2010, and the placement of the airplane into the Trust, were all done before Joaquim sought financing from 1st Source for the airplane in September 2010. In fact, Joaquim's attorney directed 1st Source as to the pre-existing ownership structure and directed 1st Source on the names that would need to appear on the loan documents.

With respect to the Indicative Financing Proposal and the Finance Commitment Letter, the Court rejects Joaquim's argument that these documents indicate that 1st Source provided advice or opinions of any kind on the compliance of the ownership structure with Brazilian laws (or more importantly, advised Joaquim on the appropriateness of personal use of the airplane). Rather, the documents make clear that the terms provided by 1st Source—which it believed were lawful and hoped met Joaquim's "objective" and "desires"—unambiguously concerned financing of the airplane. Moreover, there is no evidence in the record suggesting that 1st Source was advised during the lending process that the intended use of the airplane might not be for business purposes—the basis of the seizure in Brazil,[7] which had nothing to do with the finance terms.

As a result, 1st Source is entitled to summary judgment where no inference can be drawn on this record that it supplied false information upon which Neto justifiably relied.

## V. CONCLUSION

As of January 26, 2017, the total amount of principal, interest, late fees, and other charges, was $2,306,807.20. Interest continues to accrue at $529.32 per day. While 1st Source is also entitled to receive its attorneys' fees, expenses, and costs incurred in this litigation, it has not provided sufficient evidence to assist the Court with determining a reasonable amount of

---

[7] Again, the seizure occurred despite Joaquim's contesting the propriety of the seizure and his admitting to relying on his attorneys' advice that there was no reason for the aircraft to be seized.

attorneys' fees (although it indicated an intent to do so under Rule 54). Given 1st Source Bank's seeming reliance on the loan documents for the source of its fees, the extent of the total damages will have to await further proceedings.

For those reasons, the Court GRANTS the motion for summary judgment [DE 78] because 1st Source is entitled to summary judgment on its claim for breach against the Defendants and on Joaquim's counterclaim for negligent misrepresentation.

SO ORDERED.

ENTERED: January 25, 2018

                                                        /s/ JON E. DEGUILIO
                                                        Judge
                                                        United States District Court